## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| **EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,** | } <br> } <br> } **CIVIL ACTION NO.** <br> } <br>  **Plaintiff,**    } <br> } **3:15-cv-03104-G** <br> } <br> **v.**    } <br> } <br> **METHODIST HOSPITALS OF DALLAS,**  } <br> **d/b/a METHODIST HEALTH SYSTEM,**  } <br> } <br>  **Defendant.**    } <br> } <br>_____} |

## PLAINTIFF EEOC'S BRIEF IN RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Respectfully submitted,

ROBERT A. CANINO
Regional Attorney
Oklahoma State Bar No. 011782

/s/ Toby Wosk Costas
TOBY WOSK COSTAS
Supervisory Trial Attorney
Texas State Bar No.  04855720

/s/ Devika Seth
DEVIKA SETH
Senior Trial Attorney
District of Columbia Bar No.  975161

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION
Dallas District Office
207 South Houston Street, 3rd floor
Dallas, Texas 75202
TEL  (214) 253-2764
FAX (214) 253-2749

# TABLE OF CONTENTS

FACTS…………………………………………………………………………………1

ARGUMENT AND AUTHORITIES………………………………………………..7

I.     STANDARD OF REVIEW……………………………………………………7

II.    DEFENDANT FAILED TO REASONABLY ACCOMMODATE
COOK'S DISABILITY…………………………………………………...8

     A.      Cook was "Qualified" under the ADA………………….…8

     B.      Defendant Failed to Reasonably Accommodate
Cook's Disability……………………………………………..13

III.   DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT
ON THE EEOC'S TERMINATION CLAIM…………………………....17

IV.   DEFENDANT ACTED WITH MALICE OR RECKLESS
INDIFFERENCE TO COOK'S FEDERALLY PROTECTED
CIVIL RIGHTS………………………………………………………….21

V.    DEFENDANT'S POLICY REGARDING REASSIGNMENT
DOES NOT REASONABLY ACCOMMODATE
DISABLED EMPLOYEES……………………………………………..24

     A.   The Plain Language of the Statute and Evidence of
Congressional Intent Demonstrate that Reassignment
Means Appointment, Not Simply the Opportunity to
Compete with Everyone Else…………………………………...26

     B.   The Supreme Court Has Weighed in Since *Dougherty*…………28

     C.   For Three Circuit Courts, Sitting En Banc, Requiring
Disabled Employees to Compete for Reassignment
Does Not Fulfill the Duty to Reasonably Accommodate
Under the ADA…………………..………..………………….....30

     D.   The ADA Inherently Requires Preferential Treatment,
Not "Affirmative Action"……………………………………….34

     E.   Defendant Mischaracterizes the *Barnett* Framework…………..36

      **F.  The ADA Regulations and the EEOC's Enforcement Guidance Regarding This Particular Provision of the ADA Should be Granted Deference**………………………………….37

**VI.   THE UNDUE HARDSHIP DEFENSE PROTECTS EMPLOYERS, BUT THE BURDEN OF PROOF HAS NOT BEEN MET HERE**…………………………………………...……39

**VII.  ALLOWING REASSIGNMENT TO A VACANT POSITION DOES NOT INTERFERE WITH DEFENDANT'S RIGHT TO DEFINE THE "CORE QUALIFICATIONS FOR A POSITION."**…………………………………………………….42

**CONCLUSION**..........................................................................................................43

# Table of Authorities

## Cases

*Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284 (D.C. Cir. 1998) .................................................. 32

*Anderson v. Gus Mayer Boston Store of Delaware*, 924 F. Supp. 763, 772 (E.D. Tex. 1996) .... 40

*Baert v. Euclid Beverage, Ltd.*, 149 F.3d 626, 633 (7th Cir. 1998) ............................................... 16

*Barton v. Checkers Drive-In Restaurants, Inc.* 2011 WL 1193061 *3 (E.D. La. 2011) ............. 14

*Benson v. Northwest Airlines, Inc.*, 62 F.3d 1108, 1114 (8th Cir.1995)....................................... 36

*Burns v. Coca-Cola Enters., Inc.*, 222 F.3d 247, 257-58 (6th Cir. 2000)..................................... 10

*Burns v. Texas Refining, Inc.*, 890 F.2d 747 (5th Cir. 1989) ...................................................... 23

*Caboni v. General Motors Corp.*, 278 F.3d 448, 451 (5th Cir. 2002) ........................................... 9

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ............................................................... 9, 10

*Chevron v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 .......................................... 40

*Cortez v. Raytheon Co.,* 663 F. Supp. 2d 514, 520 (N.D. Tex. 2009) ........................................... 9

*Cravens v. Blue Cross & Blue Shield of Kansas City*, 214 F.3d 1011, 1018 (8th Cir. 2000)........ 11

*Daugherty v. City of El Paso,* 56 F. 3d 695 (5th Cir. 1995) ........................................................ 30

*Deffenbaugh-Williams v. Wal-Mart Stores, Inc.,* 188 F.3d 278, 284 n.4 (5th Cir. 1999).............. 23

*E.E.O.C. v. United Airlines, Inc.*, 693 F.3d 760 (7th Cir. 2012)................................................... 32

*EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (5th Cir. 2005)............................................ 16

*EEOC v. Service Temps*, 2010 WL 5108733 *8 (N.D. Tex. 2010) ............................................. 23

*EEOC v. Wal-Mart Stores, Inc.*, 187 F.3d 1241, 1248-49 (10th Cir. 1999) ................................. 24

*Feist v. La. Dep't of Justice, Office of the Att'y Gen.*, 730 F.3d 450 (5th Cir. 2013) ................... 10

*Green v. Administrators of the Tulane Educational Fund*, 284 F.3d 642, 654 (5th Cir. 2002)..... 24

*Guerra v. United Parcel Svc., Inc.*, 250 F.3d 739 (5th Cir. 2001)................................................ 17

*Hardin v. Caterpillar, Inc.*, 227 F.3d 268 (5th Cir. 2000) ......................................................... 23

*Hatley v. Hilton Hotels Corp.*, 308 F.3d 473, 477 (5th Cir. 2002) ........................................... 3, 24

*Heise v. Genuine Parts Co.*, 900 F. Supp. 137, 1154 & n. 10 (D. Minn. 1995) .......................... 14

*Henderson v. Ardco, Inc.*, 247 F.3d 645, 653 (6th Cir.2001) ..................................................... 14

*Hendricks-Robinson v. Excel Corp.,* 154 F.3d 685, 699 (7th Cir. 1998)...................................... 14

*Hutchinson v. United Parcel Serv., Inc.*, 883 F.Supp. 379, 397 ................................................. 14

*Irvine v. El Paso Healthcare Sys.*, 250 F.3d 744 (5th Cir. 2001) ................................................ 23

*Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 316 (5th Cir. 2007) ................................................. 17

*Kolstad v. Am. Dental Ass'n*, 527 U.S. 526 (1999) ...................................................................... 23

*Loulseged v. Akzo Nobel, Inc.*, 178 F.3d 731, 736 (5th Cir. 1999) ................................................. 16

*McGregor v. Nat'l R.R. Passenger Corp.*, 187 F.3d 1113, 1116 (9th Cir.1999) .......................... 13

*Monette v. Electronic Data Systems Corp.*, 90 F.3d 1173, 1187 (6th Cir.1996) .......................... 36

*Ransom v. State of Arizona Board of Regents*, 983 F.Supp. 895,902 (D.Ariz.1997) .................. 36

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) ........................................ 9

*Riel v. Electronic Data Systems Corp.*, 99 F.3d 678, 681 (5th Cir. 1996) ...................................... 41

*Rizzo v. Children's World Learning Ctrs., Inc.*, 213 F.3d 209, 213 and n. 5 (5th Cir. 2000) ....... 17

*Roque v. Jazz Casino Co., L.L.C.*, 388 Fed. Appx. 402 (5th Cir. 2010) ......................................... 9

*Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1162 (10th Cir. 1999) .............................. 11, 32, 34

*Taylor v. Phoenixville School Dist.*, 174 F.3d 142, 162 (3rd Cir.1999) ........................................ 17

*Taylor v. Principal Fin. Group, Inc.*, 93 F.3d 155, 165 (5th Cir.), *cert. den.*, 519 U.S. 1029 (1996)
....................................................................................................................................................... 17

*U.S Airways, Inc. v. Barnett*, 535 U.S. 391 (2002 ........................................................................ 30

*Udall v. Tallman*, 380 U.S. 1 (1965) ............................................................................................. 40

*US Airways, Inc. v. Barnett* ........................................................................................................... 15

*Waldrip v. GE*, 325 F.3d 652, 655 n.1 (5th Cir. 2003) ................................................................. 40

## **Statutes**

29 C.F.R. § 1602.14; 42 U.S.C. §1981A(b)(1) .......................................................................... 23

29 C.F.R. § 1630.2(o)(1) ............................................................................................................... 40

29 C.F.R. § 1630.2(p)(2) (1997) .................................................................................................... 41

29 C.F.R. app. §1630.2(o) (1999) ................................................................................................. 29

29 C.F.R. pt. 1630 app. § 1630.2(p) (1997) .................................................................................. 41

29 C.F.R. pt. 1630 app. §1630.15(d) (1996) ................................................................................. 41

42 U.S.C. § 12101(6) ..................................................................................................................... 28

42 U.S.C. § 12111(10)(B) (1994) .................................................................................................. 41

42 U.S.C. § 12113(b) (1994) ......................................................................................................... 21

Fed. R. Civ. P. 56(a), (c)(1) ............................................................................................................ 9

## Other Authorities

135 CONG. REC. 8998 (1989) .................................................................................... 28

H.R. Rep. No. 485(II), at 63, 101st Cong., 2d Sess. 63 (1990) .............................................. 11, 28

H.R.Rep. No. 485(II), 101st Cong., 2d Sess. at 63 (1990), ........................................................... 34

H.R.Rep. No. 485(II), 101st Cong., 2d Sess., at 56 (1990) ........................................................... 34

Reasonable Accommodation & Undue Hardship Under the

Americans with Disabilities Act,  No. 915.002 (Oct 17, 2002)……………..………………passim

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY | } | |
| COMMISSION, | } | |
| | } | CIVIL ACTION NO. |
| Plaintiff, | } | |
| | } | 3:15-cv-03104-G |
| | } | |
| v. | } | |
| | } | |
| METHODIST HOSPITALS OF DALLAS, | } | |
| d/b/a METHODIST HEALTH SYSTEM, | } | |
| | } | |
| Defendant. | } | |
| | } | |
| _____ | } | |

PLAINTIFF EEOC'S BRIEF IN RESPONSE TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

Plaintiff Equal Employment Opportunity Commission ("EEOC" or "Commission") files

this Brief in Response to Defendant's Motion for Summary Judgment. The EEOC

respectfully requests that the Court deny the motion in its entirety for the reasons set forth below.

FACTS

This is a case about petite, hard-working Adrianna Cook, who, as a result of her husband

Carlton's layoff from his job, was the sole breadwinner for her family of four in 2012. Cook was

hired by Defendant, Methodist Hospitals of Dallas, d/b/a Methodist Health System

("Defendant"), as a Patient Care Technician in December 2008. (Offer letter to Cook, App. 4).

Cook received favorable performance reviews during her tenure with Defendant. (Affidavit of

Adrianna Cook, App. 1; hereafter "Cook Aff., App. ____"; Dep. of Cherie James App., 39;

hereafter "James, App. ___"). While providing care for one of her patients in March 2012, Cook,

who stands under five feet tall, severely injured her back. Despite being diagnosed with an

1

annular tear and degenerative disk condition, she was able to work, albeit with certain restrictions, including a medical recommendation not to lift more than 20 pounds and to refrain from lifting, bending and twisting. These restrictions were known to Defendant. (Stephen Ozanne, M.D., Medical Notes, App. 6; hereafter "Ozanne Medical Notes, App. ___"; James, App. 196; Dep. of Karen Barrett, App. 166-168, 169-171; hereafter "Barrett, App. ____"; Dep. of Adrianna Cook, App. 110; hereafter "Cook Dep., App. ____"; Cook Aff., App. 1). From the time her back was injured until today, Cook is limited in performing everyday tasks, including doing household chores, caring for herself, doing the grocery shopping, interacting with her children and husband, walking, and standing. (Cook Dep., App. 129-130; Cook Aff., App. 1). Although Cook takes medication to relieve the muscle spasms in her back and to alleviate the intense pain, she still finds herself in constant pain, and, without the medication, she would not be able to function. (Cook Dep., App. 124-125, 129-130; Cook Aff., App. 1).

Intent on continuing her employment with Defendant, Cook approached her supervisor, Nurse Manager Cherie James, beginning in April 2012, and asked for different work because of her back injury. (Cook Dep., App. 115-118; James, App. 190-195). Instead of helping Cook find another job within the hospital system, James told Cook that there was nothing that she could do for Cook, and advised her to resign. (Cook Aff., App. 1).[1] The call for Cook's resignation was echoed by Human Resources Director Melonie Jackson, who also insisted that Cook should resign. (Cook Dep., App. 119-121). This call for Cook's resignation took place in James' office with Jackson on the telephone. Cook heard Jackson say that there was nothing that could be done for Cook and that she should resign. As a result, James asked Cook to bring in her resignation. (*Id*.).

---

[1] James testified that she knows Cook to be an honest person.  (James, App. 41 )

Defendant's impulsive reaction, informing Cook that there was nothing that could be done in response to Cook's accommodation requests, may not have been surprising given Defendant's complete lack of coordinated policies, procedures, and training as to requests for reasonable accommodation. (Dep. of Defendant, App. 136-139, 141, 151; hereafter "Defendant, App. ___"; *See also* Cook Dep., App. 128; James, App. 184; Dep. of Derrick Spence, App. 209-210; hereafter "Spence, App. ____"). None of the hospital personnel involved with Cook's attempt to obtain a reasonable accommodation had knowledge of who was in charge of accommodations, what steps needed to be followed, and who was ultimately responsible for making decisions regarding accommodation. Cook's direct supervisor, Cherie James, testified that it was Human Resources that would be involved in the process to accommodate employees with disabilities. (James, App. 184-185). However, Defendant's representative testified during a Rule 30(b)(6) deposition that Human Resources had no obligation or responsibility to assist an employee with an accommodation. (Defendant, App. 139). Confusion within Defendant's ranks regarding the accommodations process for disabled employees extended to the nature of a supervisor's role with this process. James testified that she understood herself to play a part with assisting an employee requesting an accommodation. (James, App. 185-186); However, Defendant testified that it is not the responsibility of a disabled employee's supervisor to assist that employee in finding different work or informing that employee about jobs that he or she could do given their disability. (Defendant, App. 137-138).

Defendant admitted that it never provided reasonable accommodation training to its employees when Cook was employed, and only provided ADA training to its staff after the EEOC filed its suit against Defendant. (Defendant, App. 151-153). James, who believed she was tasked with assisting employees with accommodation requests, but, instead hastily called for

Cook's resignation after declaring that nothing could be done for Cook, was never trained by Defendant on disability discrimination and has never seen a policy regarding accommodating employees who are disabled. (James, App. 184). Hiring Manager Derrick Spence, who was responsible for filling the Scheduling Coordinator vacancy in July 2012 – a position that Cook applied for as a reasonable accommodation – was never informed that Cook was disabled. (Defendant, App. 140). Spence, like James, was left in the dark regarding any obligation to address Cook's request for an accommodation, and had never received training from Defendant regarding the ADA. He is unaware of any mention in Defendant's employee handbook of the duty to accommodation disabled employees. (Spence, App. 213-216).

When Cook reiterated her desire to be reassigned to a job that did not require lifting or turning patients, as necessitated by her medical restrictions, the only response from Defendant was to direct her to the hospital "jobs bank." (Defendant, App. 139, 144, 145-146; Cook Aff., App. 1). In fact, Defendant states that directing Cook to the jobs bank constituted its reasonable accommodation of Cook. (Defendant, App. 145-146). Without any help from Defendant, Cook applied for eight jobs through the jobs bank between March 29, 2012, and July 2, 2012. (Cook Aff., App. 1; Cook Dep., App. 122-123). One of the jobs that Cook applied to be reassigned to was Scheduling Coordinator, a clerical job that Cook was qualified to perform without any accommodation. (Barrett, App. 174; Defendant, App. 133; Cook Aff., App. 1-2). In seeking continued work with Defendant by applying for the Scheduling Coordinator job, Cook sought work hours that would enable her to potentially attend a night class to get retraining, due to her disability. (Cook Aff., App. 2). The Scheduling Coordinator job would have fit this plan. Defendant never engaged in an interactive process to find out what Cook's plans were, what she was capable of, and any other aspects of accommodating her through a transfer. (*Id.*)

Although Cook's July 2, 2012, application was forwarded to the hiring manager, after she was deemed qualified for the job by Human Resources Business Partner Erik Leopard, she was not appointed to the Scheduling Coordinator position. (Defendant, App. 133, 134-135; Rejection letter sent to Cook, App. 9; Cook Aff., App. 2). Because there were no coordinated procedures in place, the hiring manager was never notified that Cook was disabled and had requested a reasonable accommodation of reassignment. (Defendant, App. 140). Even had the hiring manager, Derrick Spence, been aware of Cook's situation, his task, under Defendant's policy regarding filling vacancies, was to find the person he deemed most qualified for the job. (Defendant Dep., App. 142). Under Defendant's practice, disabled current workers who can no longer perform their jobs must compete, like everyone, with non-disabled candidates, both internal and external, for open positions. (Defendant, App. 143-144). Spence picked an external, non-disabled candidate for the Scheduling Coordinator job. (Spence, App. 211-212).

Before Cook was informed that she had been rejected for the Scheduling Coordinator job, Defendant's long-term disability insurance provider, Lincoln Financial Group, sent an e-mail to Defendant's Benefits Department staff on July 9, 2012, asking if Cook could be accommodated, identifying her workplace restrictions of lifting, bending and twisting. (Lincoln Financial Group July 9, 2012, e-mail, App. 13). Three days later, the accommodation request was sent to both Human Resources Director Jackson and Karen Barrett, Director of the Employee Health & Wellness Department. (Lincoln Financial Group July 12, 2012, e-mail, App. 13; Barrett, App. 164-168). On August 6, Human Resources Director Jackson requested that Employee Health & Wellness Director Barrett make the final decision regarding whether Cook would be accommodated. (Melonie Jackson August 6, 2012, e-mail, App. 11). Without determining if there were any jobs within the hospital system that Cook could have performed with or without a

reasonable accommodation given her disabling impairment, Barrett summarily made the decision that Cook would not return to work and would be placed on an unpaid "personal leave of absence." (Barrett, App. 171, 172-173, 174, 175-176, 177). The following day, August 7, Cook was advised by letter that if she did not take the unpaid leave, her employment would be terminated. (Defendant's August 7, 2012, letter to Cook, App. 15; hereafter "Defendant's August 7 letter to Cook, App. ____"). The letter stated that if Cook was unable to work, she could be eligible for a personal leave of absence, which would be unpaid. (Defendant's August 7 letter to Cook, App. 15; Defendant's Leave of Absence Policy, App. 35; hereafter "Defendant's LOA Policy, App. ____"). The letter further stated that, in order to be entitled to this leave, Cook would have to submit a note from her physician stating that she was unable to work. (*Id*.) Cook did not secure such a note because it was not true that she was unable to work. (Cook Aff., App. 2-3).[2]

    Cook had always been able to return to work to perform a clerical job, such as the position of Scheduling Coordinator, even with her medical restrictions. (Cook Aff., App. 2). Defendant had been on notice of these restrictions as early as April 2012. (James, App. 190-196; Cook Dep., App. 111-114, 115-118). And Defendant knew that Cook could perform clerical work with the restrictions that had been placed on her. (Barrett, App. 174). Because Cook was able to work if afforded the reasonable accommodation of reassignment, she did not obtain a note from her physician stating that she was "unable to work." (Cook Aff., App. 2-3). After Cook received the August 7 letter, Defendant never informed Cook that she could apply for any vacant position if her job of Patient Care Technician was filled. (*Id.* at App. 3). Defendant

_____

[2] Months later, after a car accident injured her further, she applied for Social Security Disability benefits. The Social Security Administration rejected Cook's request for benefits. (Letter of Social Security Administration, App. 43).

terminated Cook's employment when she did not apply for the unpaid personal leave.

(Defendant's September 17, 2012, letter to Cook, App. 51). Had Defendant accommodated

Cook's disability by appointing her to the Scheduling Coordinator position, she could have

continued as an employee of Defendant and would not have been terminated. (Cook Aff., App.

2-3).  Defendant informed the EEOC on January 11, 2013, that Cook was not reassigned to the

Scheduling Coordinator position because another candidate was deemed more qualified.

(Position Statement of Defendant, January 11, 2013, App. 19).

**ARGUMENT AND AUTHORITIES**

## I.  STANDARD OF REVIEW

Summary judgment is proper when the pleadings, depositions, admissions, disclosure

materials on file, and affidavits, if any, "show that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1). All

evidence and reasonable inferences must be viewed in the light most favorable to the EEOC.

Fed. R. Civ. P. 56(c).  *See also e.g., Cortez v. Raytheon Co.,* 663 F. Supp. 2d 514, 520 (N.D. Tex.

2009); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Summary judgment is particularly ill-

suited to employment discrimination cases, which necessarily require determinations of intent

and often require credibility determinations by a trier of fact following a full trial and the

observation of witnesses and their demeanor.  *See Reeves v. Sanderson Plumbing Prods., Inc*.,

530 U.S. 133, 150 (2000) (a court "may not make credibility determinations or weigh the

evidence" in ruling on a motion for summary judgment); *Caboni v. General Motors Corp.*, 278

F.3d 448, 451 (5th Cir. 2002) (when deciding whether summary judgment was properly granted,

"this court will not weigh the evidence or evaluate the credibility of witnesses"). This case

invokes substantial issues of material fact and a substantial issue of law regarding the duty to

reassign a disabled employee under the ADA. Given the existence of this important issue of equitable relief to be ultimately decided by the Court after trial, this case should not be dismissed under Rule 56.  As such, summary judgment should be denied.

## II.  DEFENDANT FAILED TO REASONABLY ACCOMMODATE COOK'S DISABILITY

The summary judgment evidence establishes that Defendant violated the Americans with Disabilities Act ("ADA") because it failed to reasonably accommodate Cook's disability. To establish a claim for failure to accommodate, the EEOC is required to show that (1) Cook is a qualified individual with a disability; (2) Cook's disability and its consequential limitations were known by Defendant; and (3) Defendant failed to reasonably accommodate the disability. *Feist v. La. Dep't of Justice, Office of the Att'y Gen.*, 730 F.3d 450 (5th Cir. 2013); *Cortez v. Raytheon Co.*, 663 F. Supp. 2d 514 (N.D. Tex. 2009). Defendant does not dispute the second element of the *prima facie* claim.

### A.  Cook was  "Qualified" under the ADA

There is no dispute that Cook had a disabling impairment at the time of all employment decisions in this case.  The summary judgment evidence supports a finding that Cook was qualified to perform the job that she sought of Scheduling Coordinator.  Therefore, she is a qualified individual with a disability under the ADA. To be "qualified" for a position, one must be able to perform the essential functions of an employment position, either with or without reasonable accommodation. 42 U.S.C. Sec. 12111(8). Under the ADA and its regulations, "reasonable accommodation" includes "reassignment to a vacant position."  42 U.S. C. Sec. 12111(9)(B); 29 C.F.R. Sec. 1630.2(o)(2)(ii). *See also Burns v. Coca-Cola Enters., Inc*., 222 F.3d 247, 257-58 (6th Cir. 2000) (holding that "an employer has a duty under the ADA to

consider transferring a disabled employee who can no longer perform his old job even with accommodation to a new position within the [c]ompany for which that employee is otherwise qualified"); *Cravens v. Blue Cross & Blue Shield of Kansas City*, 214 F.3d 1011, 1018 (8th Cir. 2000) ("[W]e conclude that the definition of 'qualified individual with a disability' includes a disabled employee who cannot do his or her current job, but who desires and can perform, with or without reasonable accommodation, the essential functions of a vacant job within the company to which he or she could be reassigned."); *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1162 (10th Cir. 1999) (*en banc*) (holding that "a qualified individual with a disability" includes "individuals who can perform an appropriate reassignment job within the company, with or without reasonable accommodation, even though they cannot perform their existing job no matter how much accommodation is extended" (citations omitted)).

The bedrock foundation of the ADA is to enable individuals who would otherwise lose their jobs, or not be hired, due to disability to remain productive members of the workforce. The reassignment provision is aimed at this laudable goal of ensuring that disabled employees remain in the workplace as long as there is a vacancy for which they are qualified, with or without a reasonable accommodation. See e.g., H.R. Rep. No. 485(II), at 63, 101st Cong., 2d Sess. 63 (1990), reprinted at 1990 U.S.C.C.A.N. 303, 345 ("If an employee, because of disability, can no longer perform the essential functions of the job that she or he has held, a transfer to another vacant job for which the person is qualified may prevent the employee from being off work and [the] employer from losing a valuable worker.")

The Commission's 2002 *Enforcement Guidance on Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act* ("2002 *Guidance*", App. 52-95; hereafter "2002 *Guidance*, App. ___") specifically states that, as long as the disabled employee

is qualified for the vacant position, he or she "does not need to be the best qualified individual for the position in order to obtain it as a reassignment." Simply permitting an employee who seeks reassignment as an accommodation to compete for an equivalent vacant position with other qualified candidates is not sufficient. "Reassignment means that the employee gets the vacant position if s/he is qualified for it. Otherwise, reassignment would be of little value and would not be implemented as Congress intended." (2002 *Guidance*, App. 71). Before considering reassignment as a reasonable accommodation, employers should first consider those accommodations that would enable an employee to remain in his/her current position. Reassignment is the reasonable accommodation of last resort, and is required only after it has been determined that: (1) there are no effective accommodations that will enable the employee to perform the essential functions of his/her current position, or (2) all other reasonable accommodations would impose an undue hardship. However, if both the employer and the employee voluntarily agree that transfer is preferable to remaining in the current position with some form of reasonable accommodation, then the employer may transfer the employee. (2002 *Guidance*, App. 69). As discussed below, three federal Circuit Courts, sitting *en banc*, concur that reassignment means appointment to the position without competing with non-disabled individuals for the position.

There is no dispute that Cook applied for reassignment to the job of Scheduling Coordinator on July 2, 2012, as an accommodation after severely injuring her back while performing her Patient Care Technician job for Defendant. The summary evidence reveals that Cook was qualified to perform the job of Scheduling Coordinator without accommodation. Cook met all the qualifications for the job, including being able to assess potential scheduling and staffing problems, being able to perform basic math calculations, able to type at least 30 words

per minute, able to read, write, and speak English, able to effectively communicate via telephone with various levels of staff, well versed in medical terminology, with more than two years' experience. (Scheduling Coordinator Job Description App. 96-97; Cook Aff., App. 1-2).

In fact, Defendant admitted during its 30(b)(6) deposition that Cook met the minimum qualifications of the Scheduling Coordinator job. (Defendant, App. 133). Defendant's selection procedures for filling a vacant position are as follows: a Human Resources Business Partner reviews all applications submitted for an open position. The Business Partner then forwards to the Hiring Manager the applications that meet the minimum qualifications for the job. (*Id*. at 132(a)-133). The Human Resources Business Partner for the open Scheduling Coordinator job in this case was Erik Leopard. (Dep. of Erik Leopard, App. 202; hereafter "Leopard, App. ____"). Leopard forwarded Cook's application for the job of Scheduling Coordinator to the Hiring Manager *after it was determined that she had met the qualifications for the job*. (Defendant, App. 133; Leopard, App. 203-204, 205).   Defendant does not argue that Cook did not meet the substantive qualifications of the Scheduling Coordinator job. Rather, it contends that Cook was not qualified for this position because "at the time Cook applied" for the Scheduling Coordinator position, "she had not provided a physician's release to Methodist that she had been released to return to work." (Defendant's Brief in Support of its Motion for Summary Judgment, p. 14). Defendant never informed Cook that she needed a full release to return to work, and it would have been illegal for Defendant to have done so. (Cook Aff., App. 2). Full releases, also known as "100% healed" policies, are *per se* violations of the ADA because they discriminate against individuals with disabilities by permitting employers to substitute a determination of whether a qualified individual is "100% healed" from their injury for the required individual assessment whether the qualified individual is able to perform the essential functions of his or her job, with

or without accommodation. *See McGregor v. Nat'l R.R. Passenger Corp.,* 187 F.3d 1113, 1116 (9th Cir. 1999). *Barton v. Checkers Drive-In Restaurants, Inc.* 2011 WL 1193061 *3 (E.D. La. 2011); *Henderson v. Ardco, Inc.*, 247 F.3d 645, 653 (6th Cir. 2001) (100% recovery rules may have an impermissible discriminatory impact where rule allows for no subjective inquiry into individual's abilities to perform certain available jobs); *Hutchinson v. United Parcel Serv., Inc.*, 883 F. Supp. 379, 397 (N.D. Iowa 1995); *Hendricks-Robinson v. Excel Corp.,* 154 F.3d 685, 699 (7th Cir. 1998) citing *Heise v. Genuine Parts Co.*, 900 F. Supp. 137, 1154 & n. 10 (D. Minn. 1995) (holding that a "must be cured" or "100% healed" policy is a *per se* violation of the ADA because the policy does not allow a case-by-case assessment of an individual's ability to perform essential functions of the individual's job, with or without accommodation). Defendant was on notice of Cook's medical restrictions following her back injury: it was aware that, at the time she applied for the Scheduling Coordinator job, she had a 20-pound lifting restriction and a medical recommendation to refrain from bending, stooping and twisting. With these restrictions in place at the time Cook applied for the Scheduling Coordinator job, she was well able to perform this clerical job without any accommodation, and Defendant knew it. (Ozanne Medical Notes, App. 6; Stephen Ozanne, M.D., July 12, 2012, letter, App. 98; hereafter "Ozanne July 12 letter, App. ____"; Cook Aff., App. 1-2; James, App. 196, 197-198; Barrett, App. 166-171; Cook Dep. App., 110). Dr. Ozanne informed Defendant of Cook's restrictions on July 12. He explicitly stated that Cook could no longer engage in patient care work, permanently. Dr. Ozanne did not inform Defendant that she could not return to work, just not work involving patient care. (Ozanne July 12 letter, App. 98). Defendant never contacted Dr. Ozanne to determine if he needed some kind of clarification, **and Defendant never asked Cook for any kind of release, at that time or at any other time during her employment**.

12

Defendant's "release" argument may be pretextual. When first explaining why Cook was not selected for the Scheduling Coordinator position in its initial Position Statement sent to the EEOC on January 11, 2013, during its investigation, Defendant did not mention a purported lack of a release, but instead stated: "She was not the best candidate for this position, and another candidate was hired." (Defendant's Position Statement, January 11, 2013, App. 19). Defendant now appears to be alleging this "lack of release" argument in hindsight, as there is no competent summary judgment evidence to support its position that a lack of a medical release was a basis for Defendant's actions in this case.

Cook's physician, Stephen Ozanne, M.D., never informed Cook or Defendant that she was medically unable to return to work. He simply informed Defendant of her restrictions and recommended that she not engage in patient care because of her back condition. (Ozanne July 12 letter, App. 98). Despite taking FMLA leave, Cook was, at all times following her March 7, 2012, back injury, even while on leave, capable of performing a Scheduling Coordinator job, which required no lifting, carrying, bending or twisting. (Scheduling Coordinator Description App. 96-97). The summary judgment evidence supports the EEOC's position that Cook was qualified to perform and be assigned to the Scheduling Coordinator vacancy, even with her medical restrictions. Therefore, she was a qualified individual with a disability under the ADA.

**B.  Defendant Failed to Reasonably Accommodate Cook's Disability**

The summary judgment evidence supports the EEOC's claim that Defendant failed to reasonably accommodate Cook's disabling back injury. As to this third and final element of the *prima facie* case, the Supreme Court in *US Airways, Inc. v. Barnett*,[3] laid out the burden of proof for an individual with a disability alleging failure to provide reasonable accommodation. To

_____

[3] 535 U.S. 391 (2002).

defeat an employer's motion for summary judgment, an employee need only show that an "'accommodation seems reasonable on its face, i.e., ordinarily or in the run of cases." *Id.* at 401. Once the plaintiff has shown that the accommodation he or she needs is "reasonable," the burden shifts to the employer to provide case-specific evidence proving that reasonable accommodation would cause an undue hardship in the particular circumstances. *Id.* at 396.

The ADA and its regulations specify that "reasonable accommodation" includes "reassignment to a vacant position." 42 U. S. C. Sec.12111(9)(B); 29 C.F.R. Sec. 1630.2(o)(2)(ii). Defendant had an obligation to consider Cook for the Scheduling Coordinator job, and other available jobs, as an accommodation, through the interactive process which is required by the ADA.[4] *EEOC v. Sears, Roebuck & Co*., 417 F.3d 789, 797 (5th Cir. 2005), quoting *Baert v. Euclid Beverage, Ltd*., 149 F.3d 626, 633 (7th Cir. 1998) ("the ADA requires that the employer and the employee engage in an interactive process to determine a reasonable accommodation.") The Fifth Circuit has held that "when an employer's unwillingness to engage in a good faith interactive process leads to a failure to reasonably accommodate an employee, the employer violates the ADA." *Loulseged v. Akzo Nobel, Inc.*, 178 F.3d 731, 736 (5th Cir. 1999).

In this case, Defendant failed to engage in any interactive process with Cook to explore a reasonable accommodation in the form of an available permanent job that she was qualified to perform. According to Defendant, if a disabled employee communicates that he or she needs a different position due to a disability, the employee is simply directed to the hospital system's jobs bank. (Defendant Dep., App. 139). According to Defendant, no one in Human Resources has any obligation or responsibility to determine what, if any, jobs are available in the system that could accommodate a disabled employee. (*Id*.) This is Defendant's current policy and was

---

[4] Defendant does not argue that reassigning Cook to the Scheduling Coordinator job would have posed an undue hardship for the hospital system.

the policy in place when Cook worked for Defendant. (*Id*.) In fact, Defendant admits that it considers directing Cook to its jobs bank as a reasonable accommodation. (*Id*. at App. 145-146). This complete lack of participation conflicts with what the Fifth Circuit has ruled constitutes a good faith interactive process.

According to the Fifth Circuit, the interactive process is a dynamic process that requires employers to take affirmative steps to identify whether an accommodation is available for a disabled employee. In this case, Defendant simply left Cook to her own devices to identify jobs that she could perform given her disabling medical condition. (Defendant, App. 139, 145-146). This "hands off" approach by Defendant is precisely what the ADA forbids. *See e.g., Taylor v. Principal Fin. Group, Inc.*, 93 F.3d 155, 165 (5th Cir.), *cert. den*., 519 U.S. 1029 (1996) (need for bilateral discussions necessary as part of interactive process because "each party holds information the other does not have or cannot easily obtain."); *Loulseged, supra, citing Taylor v. Phoenixville School Dist.*, 174 F.3d 142, 162 (3rd Cir.1999) (in reference to the "interactive process," noting that employers will not always understand what the disabled employee is capable of and the employee will not always understand what accommodations are reasonably available); *Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 316 (5th Cir. 2007), citing *Rizzo v. Children's World Learning Ctrs., Inc.,* 213 F.3d 209, 213 and n. 5 (5th Cir. 2000) (*en banc*) (employer must make effort to communicate with employee and provide accommodations based on available information; employer's failure to communicate indicates bad faith). In a case involving the accommodation of reassignment, an employer was found to have engaged in a good faith interactive process through letters, phone calls with plaintiff, and scheduling a medical exam to determine if any reassignments were possible. *Guerra v. United Parcel Svc., Inc*., 250 F.3d 739 (5th Cir. 2001). In the *Guidance* set forth by the EEOC, "the employer, as part

of the interactive process, should ask the employee about his/her qualifications and interests…the employer is obligated to inform an employee about vacant positions for which she may be eligible… If the employer does not know whether the employee is qualified for a specific position, the employer can discuss with the employee his/her qualifications." (2002 *Guidance*, App. 70-71).

In this case, Defendant admitted its belief that its only obligation in response to Cook's request for reassignment was to direct her to the company's jobs bank. (Defendant, App. 139, 144, 145-146). Cook's direct supervisor, Nurse Manager Cherie James, admitted during her deposition that Cook spoke with her within weeks of the March 7 back injury and requested an accommodation in the form of different duties because of the injury. (James, App. 190-191). Cook was told that there was nothing that could be done to help, and that she should resign. (Cook Dep., App. 119-121; Cook Aff., App. 1). And Cook heard Defendant's Human Resources Director, Melonie Jackson, tell her, over the telephone, that she should resign because there was nothing that could be done for her. (Cook Dep., App. 119-121).

Before the decision was made to fill the Scheduling Coordinator vacancy, Defendant was aware that Cook had requested an accommodation due to her back injury and was able to perform clerical work, even given her medical restrictions. (Barrett, App. 166-171, 174). Although Barrett was tasked with the responsibility of determining an accommodation for Cook, Barrett did nothing in this regard before making the decision that Cook would not return to work. (Barrett, App. 171-176, 178). For Defendant to argue in its summary judgment brief that it fulfilled its duty to accommodate by "extending leave to Cook"[5] completely ignores the fact that it wholly failed in its obligation to interact with Cook with respect to the Scheduling Coordinator

---

[5] Defendant's Brief in Support of its Motion for Summary Judgment, p. 18.

job – a position that Cook was qualified to perform with her medical restrictions. By forcing

Cook to compete for this position, a job she was, as admitted by Defendant, qualified to perform,

Defendant failed to reasonably accommodate Cook's disability.

Instead, Defendant sent a letter to Cook on August 7, 2012, informing her that her only

option to retain her employment with the hospital system was for her to apply for unpaid

"personal leave," or her employment would be terminated, effective August 21. In this letter,

Defendant stated that this leave could be granted *if Cook submitted a physician's note indicating

that she was unable to work.* As will be elaborated upon below, Cook was not eligible for this

leave because she was able to work in a clerical position, such as the Scheduling Coordinator job,

and Defendant knew that she could do so, even given her medical restrictions. (Barrett, App.

174; Cook Aff., App. 2). When Cook did not submit a false doctor's note to trigger placement on

an unpaid personal leave of absence, Defendant terminated Cook's employment, with an

effective date of August 21, 2012. (Defendant's September 17, 2012, letter to Cook, App. 51).

Defendant's failure to engage with Cook in the interactive process in good faith was part and

parcel of its failure to provide her with a reasonable accommodation, which ultimately led to her

termination when she would not fulfill the application requirements for an unpaid leave of

absence that she was not eligible to take.

III.     **DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT
         ON THE EEOC'S TERMINATION CLAIM**

The summary judgment evidence supports the EEOC's claim that Defendant terminated

Cook's employment in violation of the ADA. Defendant's decision to discharge Cook was a

direct result of its failure to engage in the interactive process to determine an accommodation for

Cook given her medical restrictions. Despite Cook's multiple requests for reassignment to an

available permanent alternate position between April and June 2012, she was repeatedly told that

there was nothing Defendant could do for her and that she should resign. (Cook Dep., App. 119-121; Cook Aff., App. 1). Needing to work, as the sole breadwinner for her family, Cook refused to submit her resignation and instead applied for eight jobs with Defendant between March and July 2012, including the position of Scheduling Coordinator. (Cook Aff., App. 1).

During the same early-July 2012 time frame during which Cook had applied for the Scheduling Coordinator job, Director of the Employee Health & Wellness Department Karen Barrett was notified on July 12 that Cook needed an accommodation, and Barrett was informed of Cook's specific workplace restrictions. (Lincoln Financial Group July 12, 2012, e-mail, App. 13; Barrett, App. 164-168). Although Barrett was given the responsibility to determine if an accommodation existed for Cook (Melonie Jackson August 6, 2012, e-mail, App. 11), she did nothing to ascertain whether Cook could be accommodated. Between July 12 and August 6 – the day Barrett made the decision not to have Cook return to work – Barrett never determined if there were any jobs within the hospital system that Cook could have performed given her restrictions, even though Barrett knew that Cook could perform clerical work with her medical restrictions. (Barrett, App. 174). Barrett never contacted Cook regarding her request for accommodation. (*Id*. at App. 171). Barrett never requested any of Cook's medical documentation. (*Id*. at App. 175).  Instead, Barrett summarily made the decision that Cook would not return to work based on a speculative fear that she would reinjure herself. (Barrett August 6, 2012, e-mail, App. 10-11). In making the capricious decision to end Cook's employment with Defendant, Barrett wrote the following on August 6:

> From an Employee Health perspective, we do not believe that she is able to return to work at this time. To do so might increase her chance of sustaining another injury. Since it is our stance to keep employees safe, her return at this time is not advisable.

(Barrett August 6 e-mail, App. 10-11). Under the ADA, an employer may exclude an individual from employment for safety reasons only if the employer can show that employment of the individual would pose a "direct threat." "Direct threat" means "a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation." The determination that an individual poses a "direct threat" must be based on an individualized assessment of the individual's present ability to safely perform the functions of the job, considering a reasonable medical judgment relying on the most current medical knowledge and/or the best available objective evidence. See 42 U.S.C. § 12113(b) (1994); 29 C.F.R. pt. 1630 App. Sec. 1630.2(r). Without consulting with Cook's doctor, who had only restricted her from working in patient care jobs, Barrett would not allow Cook to return to work for purported safety reasons. She unilaterally, without consulting expert opinion or even Cook herself, determined that Cook somehow posed a "direct threat". Then, for reasons including that Defendant wanted to fill Cook's Patient Care Technician position, it was decided that Cook would be told to seek a personal leave of absence, rather than considering her for other available jobs. (Barrett, App. 171-177; August 6, 2012, e-mail from Melonie Jackson, App. 10). Cook was advised, by letter, on August 7, that if she did not apply for the unpaid leave, her employment would be terminated. (Defendant's August 7, 2012, letter to Cook, App. 15). The letter stated that if Cook was unable to work, she "may" be eligible for a personal leave of absence, which would be unpaid. (Defendant's August 7 letter to Cook, App. 15; Defendant's Leave of Absence Policy, App. 35). The letter further stated that, in order to be entitled to this leave, Cook would have to submit a note from her physician stating that she was unable to work. (*Id*.) Cook did not secure such a note because it was not true that she was unable to work. (Cook Aff., App. 2-3). Cook had always been able to return to work to perform a sedentary, clerical job

19

such as the position of Scheduling Coordinator, even with her medical restrictions. (*Id*. at App. 2). And Defendant had been on notice of these restrictions as early as April 2012. (James, App., 190-196; Cook Dep., App. 111-118; Barrett, App. 174). She did not obtain a note from her physician stating that she was "unable to work" – a statement that she knew would not be true. (Cook Aff., App. 2-3).

After Cook received the August 7 letter, Defendant never informed Cook that she could apply for any vacant position if her job of Patient Care Technician was filled. (*Id*. at App. 3). Because Cook was not eligible for a personal leave of absence, given the doctor's note requirement, Defendant's offer of such leave to Cook cannot be considered a reasonable accommodation.

Because Defendant's practice requires disabled employees to compete with non-disabled employees for vacant positions, Cook would have been required to have competed for any openings without the hiring managers ever taking into account her need for a reasonable accommodation. Defendant's policy regarding the time period during which a disabled employee on a personal leave of absence may seek an alternate job is confusing, and cannot be easily discerned, at least based on the letter sent to Cook. There appears to be only a thirty-day window to find a vacant position that the employee is qualified to perform. (Defendant's August 7, 2012, letter, App. 15). In response to Cook's reasoned decision to not apply for the unpaid leave, Defendant terminated her employment. (Defendant's September 17, 2012, letter to Cook, App. 51). Had Defendant accommodated Cook's disability, her employment, through appointment to the available job of Scheduling Coordinator, would not have been terminated. As such, summary judgment should be denied with respect to the EEOC's termination claim on behalf of Adrianna Cook.

## IV.  DEFENDANT ACTED WITH MALICE OR RECKLESS INDIFFERENCE TO COOK'S FEDERALLY PROTECTED CIVIL RIGHTS

The summary judgment evidence supports the EEOC's claim that Plaintiff EEOC is entitled to an award of punitive damages on behalf of Adrianna Cook against Defendant for its failure to accommodate Cook's disability, which ultimately led to her termination. In order to sustain an award of punitive damages, a plaintiff is required to show that the employer has engaged in intentional discrimination and acted "with malice or with reckless indifference to the federally protected rights" of the employee. *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526 (1999). Malicious conduct is the intentional doing of a wrongful act with knowledge that the act was wrongful. Reckless disregard is when an act is done with a lack of concern for the consequences of the action.  A jury does not need to conclude that Defendant's conduct was egregious or outrageous discrimination in order to grant an award of punitive damages to the EEOC. *See e.g.*, *Irvine v. El Paso Healthcare Sys.*, 250 F.3d 744 (5th Cir. 2001); *Deffenbaugh-Williams v. Wal-Mart Stores, Inc.,* 188 F.3d 278, 284 n.4 (5th Cir. 1999); *EEOC v. Service Temps*, 2010 WL 5108733 *8 (N.D. Tex. 2010); *Hardin v. Caterpillar, Inc.*, 227 F.3d 268 (5th Cir. 2000); *Burns v. Texas Refining, Inc.*, 890 F.2d 747 (5th Cir. 1989); EEOC Regulations, 29 C.F.R. § 1602.14; 42 U.S.C. §1981A(b)(1).

In *Kolstad*, the Supreme Court provided employers with a defense to punitive damages liability, ruling that an employer may avoid such liability if its employment decisions of managerial agents were made in contravention "to the employer's good faith efforts to comply" with anti-discrimination law." *Kolstad*, *supra*, at 545.  Regarding the "good faith" defense, generally, courts have denied summary judgment and submitted the question of punitive damages to the jury where any *one* of the following exist: (1) the employer's anti-discrimination policy is deficient or is not sufficiently distributed or publicized: (2) the employer has failed to

properly educate or train its employees regarding particular company policies or anti-discrimination laws generally; (3) the employer's response to the complaint at issue was inadequate; *or* (4) the managers responsible for enforcement or training have demonstrated personal ignorance about company policies or anti-discrimination laws generally. See e.g., *Deffenbaugh-Williams*, *supra*, at 286; *Hatley v. Hilton Hotels Corp*., 308 F.3d 473, 477 (5th Cir. 2002); *Green v. Administrators of the Tulane Educational Fund*, 284 F.3d 642, 654 (5th Cir. 2002); *EEOC v. Wal-Mart Stores, Inc*., 187 F.3d 1241, 1248-49 (10th Cir. 1999).

Defendant's only argument to support its position that the EEOC is not entitled to punitive damages is a conclusory statement that "[t]here is no evidence that Methodist discriminated against Cook in the face of a perceived risk that its actions would violate federal law or state law." (Defendant's Brief in Support of its Motion for Summary Judgment, p. 18). Defendant). Defendant cites no facts to support this statement and does not proffer the "good faith" defense, which is not surprising given the hospital system's lack of coordinated policies, procedures, and training regarding employee requests for reasonable accommodation. (Defendant, App. 136-139, 141, 151; *See also* Cook Dep., App. 128; James, App. 184; Spence, App. 209-210).

In this case, Defendant, during its 30(b)(6) deposition, admitted that it has no formal process to accommodate a disabled employee by seeking another position for that employee. (Defendant, App. 136). Defendant admitted that there is no employee in the hospital system who is tasked with assisting employees with finding accommodations. (*Id*. at App. 141). Defendant admitted that disabled employees who need an accommodation are simply directed to the jobs bank and they are fully responsible for seeking a job that will accommodate their disabilities. (*Id*. at App. 144). Defendant admitted that hiring managers are not informed if a disabled applicant is

seeking a job as an accommodation. (*Id*. at App. 140). Defendant admitted that Human Resources has no obligation to assist a disabled employee in determining what positions are available to accommodate the employee's disability. (*Id*. at App. 139). Defendant admitted that it did not provide ADA training to its employees until late 2015, well after Cook's termination in August 2012. (*Id*. at App. 151-153). When Cook was employed by Defendant, she was never presented with a written disability discrimination policy or a policy regarding reasonable accommodation. (Cook Dep., App. 128).

Cook's first-line supervisor, Cherie James, testified during her deposition that she was not sure what Defendant's practice is regarding the accommodation of employees who are disabled. (James, App. 186). During her employment with Defendant, James has never seen a written policy regarding the accommodation of employees who are disabled. (*Id*. at App. 184). And James has no recollection of receiving training on disability discrimination when Cook was employed by the hospital system. (*Id*.) Given the lack of Defendant's policies, procedures, and training regarding the accommodations process, it is not surprising that James told Cook that there was nothing that could be done to accommodate Cook and that she should resign.

Defendant's lack of policies, procedures and training regarding the accommodation of disabled employees impacted the hiring manager for the Scheduling Coordinator job. Derrick Spence testified during his deposition that he has never received training on the ADA from Defendant and is unaware of any mention in Defendant's employee handbook of the duty to accommodate disabled employees. (Spence, App. 213-216). It is, therefore, not surprising that he was never informed of Cook's need for an accommodation when she applied for the Scheduling Coordinator position.

The person responsible for the decision to terminate Cook, Karen Barrett, admitted during her deposition that she has always known that federal law prohibits disability discrimination and requires employers to provide reasonable accommodation to employees who are disabled. (Barrett, App. 179-180). And yet, what was her response to Cook's request for an accommodation? The email exchange reveals that Barrett did nothing except decide she "may" be eligible for an unpaid personal leave. (Defendant's August 7 Letter, App. 15). Her decision not to return Cook to work could be determined by a jury to be the evidentiary basis for a finding that Defendant discriminated against Cook in the face of a perceived risk that its actions would violate the ADA.

Defendant's failure to train its staff regarding the ADA and the reasonable accommodation process, its lack of written polices to educate its staff regarding the ADA and reasonable accommodation, its lack of a system to address accommodation requests from disabled employees, its attempt to force Cook's resignation in response to her requests for an accommodation, its refusal to engage in any interactive process with Cook regarding the Scheduling Coordinator job or any other vacant position demonstrates reckless indifference to Cook's federally protected rights. The EEOC respectfully requests that Defendant's motion for summary judgment on the issue of punitive damages be denied.

### V. DEFENDANT'S POLICY REGARDING REASSIGNMENT DOES NOT REASONABLY ACCOMMODATE DISABLED EMPLOYEES

On July 26, 1990, the doors to dignity, self-esteem and financial independence were opened to people with disabilities seeking to enter the workplace. With bi-partisan support, under the leadership of a conservative president, Congress voted to secure to disabled individuals the opportunity to be gainfully employed rather than being relegated to staying at home receiving Social Security disability benefits. It was a new day.

To open the door to the disabled, Congress mandated that employers provide individuals with disabilities with a "reasonable accommodation," where needed to enable them to perform the essential functions of the job. One of the accommodations specifically enacted in the wording of the statute is the accommodation of "reassignment." Reassignment was deemed a necessary accommodation applicable when there was no ability for the employee to stay in his or her current job, due to disability. And there were caveats. This accommodation did not apply to applicants, only current employees. It only came into play when there was a current vacant position. The disabled employee needed to be qualified to perform the duties of the vacant position. There was no requirement to reassign the disabled employee to a job paying more money, and no need to promote. If the only job that fit the bill was at lower pay or at a lower status, that offer was still a reasonable accommodation. And, under the statute, the employer did not have to transfer the employee where such reassignment would constitute an undue hardship. With all of these safeguards for employers in place, Congress said: Reassignment is a reasonable accommodation that an employer must offer when there is simply no way an employee can stay in his or her present job, due to a disability.

The plain language of the Act, evidence of Congressional intent, the Supreme Court, three federal circuit courts ruling *en banc*, and the EEOC in its Enforcement Guidance implementing the ADA have all explicitly addressed this issue. As characterized by the Seventh Circuit, reassignment is really an appointment to a position, not simply the chance to compete for a position offered to all employees. Forcing disabled employees to compete with non-disabled employees for a vacant position that the disabled employee is qualified to perform renders the ADA's reassignment clause meaningless. In this case, Defendant's policy of simply referring the disabled employee to the company jobs bank to compete with all employees and outside

applicants is just such a hollow gesture. It does not meet the fundamental requirement of reasonable accommodation under the ADA. The EEOC seeks this Court to find that Defendant's policy does not fulfill the mandate, and in fact does not comport with, the Americans with Disabilities Act.

**A.   The Plain Language of the Statute and Evidence of Congressional Intent Demonstrate that Reassignment Means Appointment, Not Simply the Opportunity to Compete with Everyone Else**

The ADA's text and legislative history establish that disabled employees should be reassigned to a new job, instead of being given the mere opportunity to compete with other employees, and even outside applicants, for a position. The plain language of the Act allows for reassignment of disabled employees as a form of accommodation. Under the ADA, "reasonable accommodation" includes "reassignment to a vacant position." 42 U.S.C. Sec. 12111(9)(B). Although the ADA almost completely tracks the statutory language of the Rehabilitation Act of 1973, the ADA departed from its predecessor when Congress expressly added these words to its list of reasonable accommodations. Congress recognized that persons with disabilities as a group "occupy an inferior status in our society and are severely disadvantaged socially [and] economically." 42 U.S.C. § 12101(6). The ADA empowered individuals with disabilities "to decide for themselves what kind of life they want to lead, and provides a meaningful and effective opportunity to become independent and productive members of our society." See 135 CONG. REC. 8998 (1989). Consistent with this Congressional finding, the reassignment provision is aimed at enabling current employees, who would otherwise lose their jobs due to disability, to remain in the workforce as long as there is a vacancy for which they are qualified. See, e.g., H.R. Rep. No. 485(II), at 63, 101st Cong., 2d Sess. 63 (1990), reprinted at 1990 U.S.C.C.A.N. 303, 345 ("If an employee, because of disability, can no longer perform the

26

essential functions of the job that she or he has held, a transfer to another vacant job for which the person is qualified may prevent the employee from being out of work and [the] employer from losing a valuable worker.")  In enacting the ADA, Congress said, plainly and in line with the intent of the statute, that reassignment to a vacant position is a reasonable accommodation. Nothing in the statute or legislative history suggests that Congress intended that employees needing reassignment as a reasonable accommodation should be required to apply for and compete with non-disabled employees who do not need such an accommodation. Such a requirement can simply not be viewed as an accommodation at all.  While the non-disabled employee seeking a transfer can continue in his or her current job if not selected, the disabled employee is faced with termination, based on disability.  In no way can such an "opportunity" to compete be viewed as an accommodation under the ADA.

In citing words from the Congressional record about the treatment of applicants, rather than current employees, Defendant ignores the fact that, in enacting the reassignment provision to the ADA, Congress chose to treat current employees differently from job applicants.  For example, an applicant can be subject to a medical screening before hire, and hire can be conditioned upon the outcome of that screening.  The Interpretive Guidance to the ADA regulations explicitly recognizes that only current employees have a right to reassignment to another position as a reasonable accommodation. *See* 29 C.F.R. app. §1630.2(o) (1999) ("Reassignment is not available to applicants.")  Defendant's reliance on quotes from members of Congress about applicants should not be applied to the reassignment of current employees who cannot continue in their jobs due to disability.

**B.  The Supreme Court Has Weighed in Since *Dougherty***

In 2002, the Supreme Court determined that preferences for disabled employees needing a reasonable accommodation under the ADA are appropriate. *U.S Airways, Inc. v. Barnett*, 535 U.S. 391 (2002). The Supreme Court has weighed in since the Fifth Circuit's decision in *Daugherty v. City of El Paso,* 56 F. 3d 695 (5th Cir. 1995), to explicitly establish that the requirement of reasonable accommodation incorporates the possibility of granting what can be viewed as a preference in order to maintain the employment of a disabled individual.  *See Barnett*, 535 U.S. at 397.  Preferential treatment, under its ruling, is a legitimate and necessary component of reasonable accommodation.  *Id.* at 398. ("The simple fact that an accommodation would provide a 'preference' . . . cannot, in and of itself, automatically show that the accommodation is not 'reasonable.'").  Like Adriana Cook, Robert Barnett, an airline cargo handler, injured his back on the job. He was able to transfer to a mailroom position through the company's seniority system.  Then, more senior employees sought to bid for the mailroom job. Barnett sought to keep the job as a reasonable accommodation under the ADA, despite the seniority system.  The Supreme Court in *Barnett* rejected the argument that what could be viewed as "preferences" were never allowed under the ADA, noting that this interpretation "fails to recognize what the Act specifies, namely, that preferences will sometimes prove necessary to achieve the Act's basic equal opportunity goal."  *Id.* At 397.  The ADA "requires preferences in the form of 'reasonable accommodations' that are needed for those with disabilities to obtain the *same* workplace opportunities that those without disabilities automatically enjoy.  By definition, any special 'accommodation' requires the employer to treat an employee with a disability different, i.e. preferentially." *Id.* (emphasis in original).

Defendant cites language in *Barnett* that addresses a seniority system, which is not applicable herein: "[p]laintiff must explain why, in the particular case, an exception to the employer's seniority policy can institute a 'reasonable accommodation.'" (Defendant's Brief, p. 24). Defendant attempts to extrapolate that, in every instance where an employee needs an accommodation, the employee needs to show "special circumstances" to warrant a reappointment for the disabled current employee to a vacant job. This theory is not what the Court espoused in *Barnett,* and subsequent interpretations of *Barnett* in federal circuit courts have not taken this position. Every disabled person for whom there is no accommodation available to continue in his job automatically has circumstances that warrant the accommodation of reassignment, if there is a job that is available and the employee has the qualifications for the job. There is no support for Defendant's position that, under *Barnett,* "special circumstances" for appointing the disabled current employee to a vacant job is required.

The facts of the *Daugherty* case, cited by Defendant, arose soon after the effective date of the ADA, in June 1991. The case did not turn on the issue of "affirmative action" for the disabled; other facts undercut Daugherty's claims. Daugherty was a city bus driver who lost his job under U.S. Department of Transportation guidelines when he was diagnosed with insulin-dependent diabetes. While employees "physically incapacitated" from performing their jobs were given the highest priority, full-time employees were given priority over part-time employees. *Daugherty, supra,* at 699. Daugherty was a part-time employee. In addition to this factor operating against his claim, there were questions as to Daugherty's willingness to accept other positions, and as to his lack of initiative regarding taking an entrance exam for an airport shuttle bus position, which he might have qualified for. Given these other operative factors, the *Daugherty* ruling was not based on whether or not Daugherty had to compete with other

employees of the city of El Paso for a transfer.  Moreover, and most important, the Supreme

Court's ruling in *Barnett*, which directly addresses preferences for the disabled in discrete

circumstances, affects, and supersedes *Daugherty's* "affirmative action" dicta.

The instant case, unlike any case out of the Fifth Circuit cited by Defendant, squarely

addresses a situation where an employee, who could not otherwise be accommodated, was

required to compete for reassignment to a job which was available, and which she was qualified

to perform.  Given, in particular, the Supreme Court's position that preferences are inherent in

the duty to accommodate in specific instances such as this, the EEOC requests that this Court

deny Defendant's request to dismiss the EEOC's claim that Defendant's reassignment policy

violates the Americans with Disabilities Act.

C.   **For Three Circuit Courts, Sitting *En Banc*, Requiring Disabled Employees to
     Compete for Reassignment Does Not Fulfill the Duty to Reasonably Accommodate
     Under the ADA**

Three federal circuit courts, sitting *en banc*, hold that the duty to accommodate under the

ADA requires reassignment without competition.  *E.E.O.C. v. United Airlines, Inc.*, 693 F.3d

760 (7th Cir. 2012) (*en banc*) (*cert. den.,* 693 F.3d 760 (September 7, 2013); *Aka v. Washington

Hosp. Ctr.*, 156 F.3d 1284 (D.C. Cir. 1998) (*en banc*); *Smith v. Midland Brake, Inc.*, *supra.*

In the most recent ruling of the three *en banc* decisions, *EEOC v. United Airlines*, *Inc.*,

*supra,* the Seventh Circuit reversed its previous ruling dismissing the plaintiff's case, in light of

*Barnett*.  The Court held that "the ADA does indeed mandate that an employer appoint

employees with disabilities to vacant positions for which they are qualified, provided that such

accommodations would be ordinarily reasonable and would not present an undue hardship to that

employer." *United Airlines*, *supra,* at 765. "The Supreme Court has found that accommodation

through appointment to a vacant position is reasonable…Absent a showing of undue hardship, an employer must implement such a reassignment policy." *United Airlines, supra,* at 764.

In another *en banc* decision, the D.C. Circuit Court of Appeals viewed the ADA as requiring more of an employer than simply allowing a disabled employee to compete equally with other job applicants for a vacant position. *Aka v. Washington Hospital Center*, *supra.* Aka, like Adrianna Cook, worked in a hospital. For 19 years, he had worked as an operating room orderly at Washington Hospital Center before undergoing bypass surgery. After rehabilitation, Aka's doctor told him he could return to work provided that his job involved only a "light or moderate level of exertion." *Aka*, *supra*, at 1286. The physical demands of his job did not meet this limitation, so he requested a transfer to a job within his medical restrictions. The hospital instead placed him on an eighteen-month leave to look for a job, informing him "it was his responsibility to review WHC's job postings and to apply for any vacant jobs that interested him." *Id.* Hence, Aka applied and interviewed for numerous positions within the hospital. Although he met the qualifications for these positions, the employer rejected him each time in favor of a non-disabled applicant the hospital deemed more qualified. Aka filed suit, alleging that the hospital's failure to reassign him violated the ADA.

The D.C. Circuit Court pointed to the text of the ADA and concluded that "the word 'reassign' must mean more than allowing an employee to apply for a job on the same basis as anyone else." *Aka, supra*, at 1304. The court reasoned that an employee who applies for and obtains a job elsewhere in the company would not be described as having been "reassigned." *Id.* (stating "(a)n employee who on his own initiative applies for and obtains a job elsewhere in the enterprise would not be described as having been 'reassigned'" since "the core word 'assign' implies some active effort on the part of the employer"). The majority also rejected the dissent's

position that placing a disabled employee in a vacant position, notwithstanding the qualifications of other applicants, amounts to a prohibited preference. *Id.* (rejecting the dissent as misunderstanding "both the text and legislative history of the statute" and deviating "from the construction of the statute by other circuits"). The majority's review of the legislative history revealed that Congress intended disabled employees to be treated differently than other job applicants.

> Although the ADA's legislative history does warn against 'preferences' for disabled *applicants*, *see* H.R.Rep. No. 485(II), 101st Cong., 2d Sess., at 56 (1990), *reprinted* in 1990 U.S.C.C.A.N. 267, 338, it also makes clear that reasonable accommodations for existing *employees* who become disabled on the job do not fall within that ban. *See* H.R.Rep. No. 485(II), 101st Cong., 2d Sess. at 63 (1990), *reprinted* in 1990 U.S.C.C.A.N. 267, 345 ("If *an employee*, because of disability, can no longer perform the essential functions of the job that she or he has held, a transfer to another vacant job for which the person is qualified may prevent the employee from being out of work and [the] employer from losing a valuable worker") (emphasis added).

*Id.*

In *Smith v. Midland Brake, Inc.,* 180 F. 3d 1154 (10th Cir. 1999) (*en banc*), the Tenth Circuit concluded that the ADA requires employers to accommodate a qualified disabled employee through placement of the disabled employee in a vacant position, even though an applicant deemed more qualified is interested in that position. *Smith, supra*, at 1169-70. The Court held that "'reassignment' must mean something more than the mere opportunity to apply for a job with the rest of the world." Like Adriana Cook, Robert Smith was injured on the job. He developed muscular injuries and chronic dermatitis as a result of seven years of exposure to chemicals and solvents while working in the defendant's facility. The defendant terminated Smith because his disability rendered him unable to work in his regular position or any other position in his department. Ruling in favor of the employee, the Court concluded:

The unvarnished obligation derived from the statute is this: an employer discriminates against a qualified individual with a disability if the employer fails to offer a reasonable accommodation. If no reasonable accommodation can keep the employee in his or her existing job, then the reasonable accommodation may require reassignment to a vacant position so long as the employee is qualified for the job and it does not impose an undue burden on the employer. Anything more, such as requiring the reassigned employee to be the best qualified employee for the vacant job, is judicial gloss unwarranted by the statutory language or its legislative history.

*Id.* at 1169. The majority also relied on both the EEOC's *Enforcement Guidance* and the ADA's legislative history as providing additional support for its decision that reassignment means that a disabled employee has a right to the accommodation so long as the employee is qualified for that position:

Finally, if there is any ambiguity in what Congress intended to include within the ADA definition of discrimination, we should give some deference to the EEOC, which is charged in part with administering the ADA. As previously quoted in this opinion, in the EEOC Interpretative Guidance, the EEOC posed the question: "Does reassignment mean that the employee is permitted to compete for a vacant position?" The EEOC answered that question, "No. Reassignment means that the employee gets the vacant position if s/he is qualified for it. Otherwise reassignment would be of little value and would not be implemented as Congress intended."

*Id.* at 1170-1171. The court also stated that interpreting the statute so as to only give disabled employees a right to be considered for a reassignment rather than to actually be reassigned would allow the employer to "go through the meaningless process of consideration of a disabled employee's application for reassignment and refuse it in every instance." *Id.* at 1167. The court elaborated that it would be "cold comfort" for the disabled employee to know that "his or her application was 'considered' but that he or she was nevertheless still out of a job" when the employee "was otherwise qualified" and had "a reasonable claim to reassignment." *Id.*

In addition to these *en banc* Circuit Court decisions, other federal courts have similarly held that a reasonable accommodation can require assignment to an available position.

Reasonable accommodation,…does not require that an employer create a light-duty position or a new permanent position. But, if an employer has a vacant light-duty position or a vacant permanent position for which the disabled employee is qualified, it would be a reasonable accommodation to reassign the employee to that position. If the position was created as temporary job, the reassignment to that position need only be for the temporary period of the job…if a light-duty job is a permanent job, the assignment to the job must be for the entire time the job exists. Obviously, the employer is not required to reassign a disabled person to a vacant position unless the disabled person is qualified for the position. A disabled person is qualified for a vacant position if he can perform the "essential functions" of the position, with or without a reasonable accommodation, such as a restructuring, with regard to the position.

*Michilin Tire Corp.,* 860 F. Supp. 1488, 1492 (M.D. Ala. 1994). *See Benson v. Northwest Airlines, Inc.*, 62 F.3d 1108, 1114 (8th Cir. 1995); *Monette v. Electronic Data Systems Corp.*, 90 F.3d 1173, 1187 (6th Cir. 1996) (If an employer knows that a position for which the disabled applicant is qualified will become vacant in a short period of time, the employer may be required to offer the position to the employee.); *Ransom v. State of Arizona Board of Regents*, 983 F. Supp. 895,902 (D. Ariz. 1997) ("[T[his Court rejects defendants' contention that disabled employees are entitled to reassignment accommodations under the ADA only in the same way as an employer provides for reassignment of nondisabled employees.").

As three Circuit Courts and other federal courts have recognized, the ordinary meaning of the word "reassign" is to appoint, not permit to compete. A disabled employee who only gets a job after competing for it with other employees is getting hired into a new position, not "reassigned" as that term is intended under the ADA. Defendant's "hands off" approach, involving not a modicum of participation by the employer, cannot be what Congress intended when it added the reassignment clause to the Rehabilitation Act model for the ADA.

**D. The ADA Inherently Requires Preferential Treatment, Not "Affirmative Action"**

Defendant contends that reassignment without competition would constitute "affirmative action." Affirmative action for individuals of a particular race or ethnic group is a classwide

remedy for past discrimination, borne of Executive Orders by a series of U.S. Presidents. It is not an obligation imposed by the language of Title VII. On the other hand, the duty to accommodate is mandated by the statutory wording of the ADA. The accommodation of reassignment will always be a rare one. It only comes into play when substantive prerequisites are in place: (1) there is no other reasonable accommodation possible; (2) there is no uniformly-applied seniority system in place (under *Barnett*); (3) there is an open position available within a short period of time after the employee needs the transfer; and (4) the employee meets the requirements of the job description for the available job. Unlike policies affecting broad classes of people, reassigning—essentially transferring—an employee to an available position has a very limited impact on the employer and should not be equated with "affirmative action." The Supreme Court, subsequent to *Daugherty,*, has adopted the term "preferences," in describing what is reasonable under the ADA. The decades-old, arguably perfunctory characterization of reassignment in *Daugherty*, arising out of facts that occurred soon after the enactment of the ADA, has been superseded by the Supreme Court's holding in *Barnett.*

The consequences of a require-to-compete rule, for a disabled person, are devastating. If the disabled employee is denied the requested reassignment, the disabled employee is out of a job. An employer's duty to reassign arises only if a disabled employee cannot be accommodated in the disabled employee's current position. Because reassignment is the accommodation of last resort, the opportunity to be placed in this vacant position represents the disabled employee's last hope to remain employed with that employer, and, possibly, any employer, since the reassignment preference only applies to current employees, not applicants. The non-disabled worker is not so affected, remaining with his or her employer with opportunities to move into other positions in the future.

Defendant claims that transferring a disabled employee to keep him on the job "conflicts with the rights of other employees" and does not fulfill "employee expectations of fair and uniform treatment."  By this argument, any decision by an employer to accommodate a disabled employee could infringe on the non-disabled members of the workforce.  An employee granted an expensive ergonomic chair could draw the ire of co-workers, who feel relegated to less comfortable seating.  An employee with cancer is allowed to modify his work schedule, arriving later and working later, to enable him to receive chemotherapy.  An employee with young children might also prefer to work on such a modified schedule, but there is no obligation imposed by federal law on the employer to permit that job change.  An employee who is allowed to take breaks to test for and inject insulin could be viewed with jealousy by co-workers not allowed such breaks.  An employee with MS granted a close-in parking space could provoke antipathy toward the employer as a co-worker treks across a hot parking lot at the end of the day to drive home.  An employer, even in providing the "*de minimis*"[6] accommodation of religious beliefs required under Title VII, may encounter resentment of the accommodated employee by co-workers.  The very nature of accommodation requires that a demonstration of empathy and forbearance be encouraged.  Reasonable accommodation is a legal duty that President George H. Bush, with bipartisan support of Congress, codified into law to protect the disabled.  The ADA, like the Age Discrimination in Employment Act of 1968, as amended, is a statute that any employee could someday need to invoke, to ensure a workplace free from discrimination.

### E.  Defendant Mischaracterizes the *Barnett* Framework

Applying the Supreme Court's two-step framework in *Barnett* does not, as claimed by Defendant, require an analysis of "position-specific and employee-specific facts" presented by

---

[6] *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63 (1977).

the employee (Defendant's Brief, p. 24). The first step, under *Barnett*, is for the court to consider whether simple appointment to a different job is ordinarily, "in the run of cases," a reasonable accommodation. The Supreme Court "assume[d] that normally such a request would be reasonable within the meaning of the statute, were it not for one circumstance, *namely that the assignment would violate the rules of a seniority system*." 533 U.S. at 403 (emphasis added). Thus, even where there is a seniority system in place, the employee has the opportunity to show that special circumstances warrant a finding that the requested accommodation is reasonable on the particular facts. *Barnett, supra,* at 405.

Here, as in the 2012 *United Airlines* case, *supra*, there is no seniority system at issue. In a situation such as this, "[t]he Supreme Court has found that accommodation through appointment to a vacant position is reasonable. Absent a showing of undue hardship, an employer must implement such a reassignment policy." *United Airlines*, *supra*, at 764. It is the employer, not the employee, that bears the burden to "show special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances." *Barnett*, *supra*, at 402, Fn.1.

## F. The ADA Regulations and the EEOC's Enforcement Guidance Regarding This Particular Provision of the ADA Should be Granted Deference

The regulations to the ADA, along with the EEOC's 2002 *Enforcement Guidance* interpreting the statute and the regulations, state that requiring a disabled employee to compete for a vacancy is not a reasonable accommodation under the law. (2002 *Guidance*, App. 71). As the agency tasked with enforcing the ADA, the regulations and Guidance on this subject support the position of the Plaintiff EEOC, recognized by judicial precedent in other jurisdictions, that requiring an employee to compete just like any other employee is not a reasonable accommodation as required by the ADA.

The *Guidance* specifically states that, as long as the disabled employee is qualified for the vacant position, he or she "does not need to be the best qualified individual for the position in order to obtain it as a reassignment."  Simply permitting an employee who seeks reassignment as an accommodation to compete for an equivalent vacant position with other qualified candidates is not sufficient.  "Reassignment means that the employee gets the vacant position if s/he is qualified for it. Otherwise, reassignment would be of little value and would not be implemented as Congress intended."  (*Id.*)

"Ever since the Supreme Court's decision in *Chevron v. Natural Resources Defense Council, Inc.*, 467 U.S. 837,… courts have recognized that the agency responsible for administering a regulatory scheme is often in the best position to interpret that scheme. Economies of scale, collective expertise, and other factors weigh in favor of deferring to the agencies who are most familiar with specialized issues of regulation."  *Anderson v. Gus Mayer Boston Store of Delaware*, 924 F. Supp. 763, 772 (E.D. Tex. 1996) (citing *Chevron* at 843-44). Where the statute allows the agency to issue regulations, the agency's interpretations are given "controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Id.*  The Enforcement Guidelines issued by the EEOC, interpreting its own regulations, should be given an even higher standard of deference.  *Anderson, supra*, citing *Udall v. Tallman*, 380 U.S. 1 (1965).

The Fifth Circuit, in *Feist v. Louisiana, supra,* rejected Defendant's assertion that the EEOC's regulations, specifically, the definition of reasonable accommodation at 29 C.F.R. § 1630.2(o)(1), are not entitled to *Chevron* deference, and in so doing cited *Waldrip v. GE*, 325 F.3d 652, 655 n.1 (5th Cir. 2003) as "suggesting that EEOC regulations interpreting  Sections 12111 and 12112 of the ADA are entitled to *Chevron* deference."  *Feist* at 454, n. 4.

## VI. THE UNDUE HARDSHIP DEFENSE PROTECTS EMPLOYERS, BUT THE BURDEN OF PROOF HAS NOT BEEN MET HERE

A claim of undue hardship cannot be based on the fact that provision of a reasonable accommodation might have a negative impact on the morale of other employees. (2002 *Guidance*, App. 76). As set forth in the regulations to the ADA and the Interpretive Guidance to the ADA regulations, generalized conclusions will not suffice to support a claim of undue hardship. Instead, undue hardship must be based on an individualized assessment of current circumstances that show that a specific reasonable accommodation would cause significant difficulty or expense. *See* 29 C.F.R. pt. 1630 app. §1630.15(d) (1996). A determination of undue hardship should be based on several factors, including:

- o the nature and cost of the accommodation needed;

- o the overall financial resources of the facility making the reasonable accommodation; the number of persons employed at this facility; the effect on expenses and resources of the facility;

- o the overall financial resources, size, number of employees, and type and location of facilities of the employer (if the facility involved in the reasonable accommodation is part of a larger entity);

- o the type of operation of the employer, including the structure and functions of the workforce, the geographic separateness, and the administrative or fiscal relationship of the facility involved in making the accommodation to the employer;

- o the impact of the accommodation on the operation of the facility.

*See* 42 U.S.C. § 12111(10)(B) (1994); 29 C.F.R. § 1630.2(p)(2) (1997); 29 C.F.R. pt. 1630 app. § 1630.2(p) (1997), cited in *Riel v. Electronic Data Systems Corp.,* 99 F.3d 678, 681 (5th Cir. 1996). Undue hardship is an affirmative defense. Defendant has not met its burden to establish in any specific or verifiable way that the occasional duty to reappoint an employee faced with the final accommodation "of last resort" – transfer to a different available job that he or she is

qualified to perform – would impede the operations of its business.  There is simply no evidence

presented as to how a change in this particular policy would affect its ability to abide by its

proffered list of laws. The EEOC in no way suggests that Defendant should reduce its adherence

to meeting accreditation standards, or ignore or change its observance of laws or regulations

governing hospitals.  Defendant has not shown how rare instances of reappointing the disabled

employee who meets all of the enumerated criteria set forth above would meet the burden of

establishing an undue hardship. Defendant's attempt to prophesize a loss of stature once such a

policy were instated is completely speculative. In what way, for example, would HIPAA or False

Claims Act requirements be hampered?  If one were compelled to engage in speculation,

initiating such a policy could actually enhance Defendant's status as a "Best Place to Work in

Healthcare."  There is no evidence presented that United Airlines, Inc., the  Defendant in the

Seventh Circuit's 2012 ruling, *United Airlines, supra,* has experienced the type of consequences

hypothesized by the Defendant since the airline changed its policy to not require disabled

employees to compete for reassignment. In fact, as recently as four months ago, Defendant was

served with a 30(b)(6) notice of deposition that required presenting a witness to testify regarding

its undue hardship defense.  (EEOC Second Amended Notice of 30(b)(6) Deposition, App. 99-

105).  Defendant swore it had no knowledge of any facts that would support the undue hardship

defense set forth in its Answer.[7]  Defendant has not established through competent summary

---

[7]    23   Q.  Ms. Andrews, if I could direct your attention

       24   to Item No. 19 of the deposition notice, it's Third

       25   Defense in Defendant Methodist Hospitals of Dallas, DBA
                    171
        1   Methodist Health System's First Amended Original
        2   Answer."  The Third Defense reads as follows:
                    40

judgment evidence that adopting a revised reassignment policy would cause Defendant undue

hardship as that term is defined under the ADA.

---

```
 3   "Defendant affirmatively asserts and contends that to
 4    maintain the employment of Adrianna Cook would impose an
 5    undue hardship on Defendant."  Are you prepared to
 6    discuss this matter today?
 7       A.  I am.
                        *  *  *
17       Q.  Do you have any documents that you brought with
18    you today that relate to this particular affirmative
19    defense?
20       A.  No, I do not.
21       Q.  Do you know if any documents exist that relate
22    to this affirmative defense?
23       A.  I do not.
24       Q.  What is the factual basis for Defendant's Third
25    Affirmative Defense?
                     172
 1       A.  I am -- I do not know what the factual basis
 2    would be for this defense.
 3       Q.  Do you know if a factual basis, in fact, exists
 4    supporting this defense?
 5       A.  No, I do not.
 6       Q.  Is Defendant claiming that to have maintained
 7    Adrianna Cook's employment would have imposed an undue
 8    hardship on Defendant?
 9       A.  Possibly.
10       Q.  What is that undue hardship?  What would have
11    been that undue hardship?
12       A.  I'm not sure what that would be.  That's why I
13    said, "Possibly."  I don't know.
                          *  *  *
         Q.  Who is the person, if any, who would have
21    knowledge of this?
22          MR. WHITING:  There isn't anybody.  I'm
23    not aware of any facts at this point that would support
24    that.  So what's your point?
25          MS. SETH:  When you filed your answer --
                     173
 1          MR. WHITING:  That's right.
 2          MS. SETH:  -- asserting affirmative
 3    defenses on a good faith basis to assert the defense --
 4    but there are no facts that you know of at this time
 5    that support this defense?
                          *  *  *
 8       Q.  (BY MS. SETH)  Is that right?  You have no
 9    knowledge of any facts to support this defense?
10       A.  That is correct.
```

(Defendant,  App. 147-150). (Emphasis added).

# VII. ALLOWING REASSIGNMENT TO A VACANT POSITION DOES NOT INTERFERE WITH DEFENDANT'S RIGHT TO DEFINE THE "CORE QUALIFICATIONS FOR A POSITION"

Defendant cites two cases brought under the ADEA for the proposition that employers are entitled to define the "core qualifications" for a position. That which Defendant determined the qualifications were for the Scheduling Coordinator, as stated in the job description, is *not being disputed* by the EEOC. Defendant has every right to create a job description that accurately describes what knowledge and skills it wants the holder of that job to fulfill. The cases cited by Defendant address an employer's decisions regarding reductions in force, addressing claims that older employees were selected based on age. Trying to extrapolate from these layoff decisions in the ADEA context, Defendant insists that the Court cannot "interfere" with decisions regarding "hiring one job candidate over another." Yet Defendant avoids, and does not address, the duty, in the ADA context, to accommodate a disabled employee struggling to stay in the workplace -- an employee who can perform a different job for the employer because he or she, based on the employer's own standards, is qualified to do so. Reassignment is not the same act as hiring a new employee into a job, and should not be compared to the layoff decisions in the age discrimination cases cited by Defendant. Reassignment is a transfer to an available job that will keep that current employee employed, because he or she is qualified to perform that vacant job. Defendant's broad brush approach does not take into account the intent and fundamental goal of the ADA: maintaining disabled employees in the workforce, rather than at home depending on disability benefits. In situations where there is no accommodation for the employee's current position; where there is a vacancy; and where the employee meets the qualifications for the vacancy, allowing the disabled employee alternate available work – to maintain his sense of self-worth, respect from others, and ability to support himself without government help – is a

reasonable accommodation. Placing this disabled current employee in the exact same position as any able-bodied candidate – even an external candidate, as in this case – constitutes a failure to accommodate in violation of the ADA.

## Conclusion

Congress clearly intended that otherwise qualified disabled employees should not be forced out of the workforce simply because they can no longer do what they were hired to do if there are other jobs available for which they are fully qualified. Limitations in the ADA itself mitigate any impact of noncompetitive reassignments. To be reassigned, the employee must meet the minimum qualifications of the position. The employer is not obligated to create a new position for the disabled employee, and does not need to appoint the disabled employee to a position that represents a promotion, or pays more. The employer has no duty to create a position, and need only consider vacant positions for the disabled individual. And finally, an employer does not have to provide a reassignment if it can prove that doing so would create an undue hardship. Requiring reassignment, where possible, and absent undue hardship, ensures that such employees who fit this criteria remain productive workers, despite a disability. Only if he is reassigned can the disabled employee enjoy the same workplace opportunities as those without disabilities enjoy – the opportunity to continue working as a productive member of the workforce. When Adriana Cook was forced to compete with all other applicants, internal and external, for positions with Defendant, she was denied a reasonable accommodation under the ADA, leading to her termination, due to her disability. Defendant's policy, requiring her and other disabled employees to compete with non-disabled employees for a vacant job for which they are qualified, denies a reasonable accommodation to the disabled in violation of the ADA.

The EEOC respectfully submits that genuine issues of material fact and law exist as to each issue raised in Defendant's Motion for Summary Judgment. As such, Plaintiff Equal Employment Opportunity Commission respectfully requests this Court to deny Defendant's motion in its entirety.

Respectfully submitted,

ROBERT A. CANINO
Regional Attorney
Oklahoma State Bar No. 011782

/s/ Toby Wosk Costas
TOBY WOSK COSTAS
Supervisory Trial Attorney
Texas State Bar No. 04855720

/s/ Devika Seth
DEVIKA SETH
Senior Trial Attorney
District of Columbia Bar No. 975161

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
Dallas District Office
207 South Houston Street, 3rd floor
Dallas, Texas 75202
TEL (214) 253-2764
FAX (214) 253-2749

## CERTIFICATE OF SERVICE

This is to certify that on August 18, 2016, I electronically transmitted the attached document to the Clerk of the Court using the ECF system of filing, which will transmit a Notice of the Electronic Filing to Defendant's counsel, EFC registrants.

/s/ Devika Seth
Devika Seth